IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**KEVIN ERMANN**,

        Plaintiff,

    vs.                                                            **No. CIV 99-494 LCS/JHG**

**TIC - THE INDUSTRIAL COMPANY,**

        Defendant.

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant's Motion for Summary Judgment, filed on March 17, 2000 *(Doc. 54)*, and Plaintiff's Motion for Partial Summary Judgment, filed March 23, 2000 *(Doc. 59)*. The Court, having considered the motions, the memoranda submitted by the parties and the applicable law, finds that the motions are not well taken and they will be **denied**.

**I. Factual Background**

Defendant TIC employs laborers on a short-term basis (i.e., several weeks or months at a time) to work on industrial construction projects. Plaintiff Kevin Ermann was employed as a pipefitter or pipefitter's helper by Defendant TIC on several occasions from 1995 through 1998, most recently as a pipefitter on a project at IMC Kalium in Carlsbad, New Mexico from January 19, 1998 through February 27, 1998.

Ermann suffers from Type I (insulin-dependent) diabetes mellitus. He must inject himself with insulin each morning, must follow a strict diet, and must consume meals and snacks at regular intervals throughout the day. He cannot wait for regular breakfast, lunch and dinner

breaks while working on a construction site, but must take mid-morning and mid-afternoon breaks to eat a small snack to maintain his blood glucose levels. In order to prevent a severe hypoglycemic episode that could lead to unconsciousness, Ermann must also stop work to eat a snack whenever he feels his blood glucose level dropping.

Ermann informed his supervisors of his diabetes when he began work on the IMC Kalium project. He also trained a co-worker to assist him if he should have an insulin reaction on the job. TIC allowed Ermann to take mid-morning and mid-afternoon snack breaks to keep his blood sugar level within the proper range.

On three different dates in February 1998, Ermann experienced incidents related to his diabetes while on the job site. There are factual disputes as to what took place during these incidents, but in each case it appears that Ermann's blood glucose level fell and Ermann experienced a reaction. The first incident took place on February 10, 1998. Ermann apparently felt his blood glucose level falling and felt somewhat disoriented. After taking a break to get his glucose level back in balance, Ermann returned to work. That same day, he saw a doctor to check his diabetes medication. His physician determined that his diabetes was controlled, and issued a release allowing him to return to work.

On February 17, 1998, Ermann suffered a more serious incident. On that day, Ermann became unconscious due to low blood glucose and had to be taken to the hospital. His doctor lowered his insulin levels after that episode, and he returned to work. After this incident, he was assigned to work on the ground level in the "fab yard."

The third incident occurred on February 27, 1998. That day, Ermann felt his blood sugar level falling again. He took about a thirty minute break to drink a soda and eat some candy. Again, there is some dispute as to what took place, but it appears Ermann did not lose

consciousness and returned to work. Several minutes after Ermann returned to work, his supervisor, Wayne Brazier, came to his work site and informed him that he was being terminated until he could get his diabetes medication balanced.

In addition to alleging that he was terminated because of his diabetes, Ermann claims that TIC supervisors and co-workers made it uncomfortable for him to take snack breaks during the day by making "snide comments" implying that Ermann was malingering or not pulling his weight. Ermann also claims that he did not receive a pay increase that he was entitled to receive, allegedly because a supervisor was concerned that his diabetes would affect his attendance or productivity. Again, these allegations are disputed by Defendant, but Plaintiff presents evidence that, with a proper foundation, could be admissible at trial to support these contentions.

**II. Standard of Review**

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. A party opposing summary judgment must come forward with sufficient evidence that would support a jury verdict and thereby justify sending the case to the jury. *See Bancoklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1098 (10th Cir. 1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. *See Dye v. United States*, 121 F.3d 1399, 1403 (10th Cir. 1997).

**III. Analysis**

Plaintiff brings claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

12112(a), and the New Mexico Human Rights Act ("NMHRA"), N.M. Stat. Ann. § 28-1-7. Both the ADA and the NMHRA make it unlawful for an employer to discriminate on the basis of an individual's disability. To prevail on a claim for discrimination under the ADA, an employee must establish (1) that he or she is "disabled" under the Act; (2) that the individual is qualified to perform the essential functions of a job with or without reasonable accommodations, and (3) that an adverse employment decision was made on account of the disability.

The NMHRA proscribes discrimination based on "physical or mental handicap or serious medical condition." N.M. Stat. Ann. § 28-1-7 (A). As Defendant notes in the memorandum in support of its motion for summary judgment, the analysis of the state and federal claims are substantially similar because New Mexico courts look to analogous federal case law when interpreting analogous state laws. *See Investment Co. of the Southwest v. Reese*, 117 N.M. 655, 875 P.2d 1086 (1994). It should be noted that the NMHRA claims are potentially broader than the ADA claims because New Mexico includes individuals with a "serious medical condition" within the scope of the protected class.

Defendant argues in its motion for summary judgment that Ermann is not "disabled" as that term is used under the ADA, and that TIC's decision to terminate Ermann was based on legitimate business reasons and not on the basis of his disability. Plaintiff's cross motion for partial summary judgment seeks summary judgment for Plaintiff on the ADA claim, asserting that the undisputed facts demonstrate that Plaintiff was regarded as disabled by TIC and that he was discharged because of his perceived disability. Thus, three pivotal issues control the disposition of both motions: was Ermann "disabled" for the purposes of the ADA, was Ermann not "qualified" under the ADA because he failed to take proper steps to control his diabetes, and was Ermann discharged because of his disability or for legitimate safety reasons? As the analysis

4

below indicates, there are material factual disputes as to each of these issues that prevent summary judgment for either Plaintiff or Defendant.

### A. Was Ermann "disabled" for the purposes of the ADA?

The ADA defines a "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of the individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The EEOC has issued regulations that define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). "Substantially limited" is defined in the EEOC regulations as "unable to perform a major life activity that the average person in the general population can perform" or "significantly restricted as to the condition, manner or duration under which the average person in the general population can perform the same major life activity." 29 C.F.R. § 1630.2(j).

The Supreme Court has decided that whether a person is "disabled" for the purposes of the ADA is determined after consideration of both the positive and negative effects of corrective and mitigating measures. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, __, 119 S. Ct. 2139, 2146 (1999). Whether an individual is disabled requires an individualized inquiry into the effects of the impairment on the life of the individual, including negative side effects that result from the use of mitigating measures. *See id.*, 119 S. Ct. at 2147. Thus, whether an individual is "disabled" for the purposes of the ADA is a question of law based on underlying factual inquiries of whether the impairment substantially limits a major life activity after taking proper corrective measures, whether the individual has a record of such an impairment, and whether an individual is

regarded by an employer as having such an impairment.

       In the present case, Plaintiff presents evidence that his diabetes affects his attitude towards having children, his eating habits, and his work activities. I reject the notion that Ermann's belief that he should not have children because he does not want to subject them to what he has gone through is sufficient to constitute a "significant effect on the major life activity of reproduction." As the EEOC regulations state, a substantial limitation must cause a person to be unable to perform the activity or significantly restricted in the performance of the activity. Ermann's diabetes does not render him unable to reproduce, and his subjective opinion on whether he should have children cannot rise to the level of a substantial restriction on reproduction. To hold otherwise and allow subjective opinions to constitute a "substantial restriction" on a major life activity would broaden the term "disabled" to include almost anyone. For example, a person who holds a belief that he or she should not be required to work would become "disabled" under this interpretation because this subjective belief would substantially restrict the major life activity of work.

       However, I conclude that there are factual issues as to whether Ermann's major life activities of eating and working are significantly affected by his diabetes. Ermann presents evidence that he cannot go more than about three hours without eating a snack, and must take regular breaks during the workday that other employees do not normally take. He also must take a break whenever he feels his blood sugar levels dropping. In today's competitive job market where employees such as Ermann must compete for short-term temporary jobs, these limitations imposed by Ermann's diabetes could substantially affect his ability to compete for jobs. Whether the need for these breaks rise to the level of a "substantial effect" on these life activities of eating and working is a disputed issue best left to the jury.

Ermann also presents evidence that could support a jury finding that TIC's supervisors regarded him as being disabled. It is undisputed that Ermann's supervisors were aware of his diabetes, and that his supervisors required a work release from a physician on two occasions before he was allowed to return to work. Furthermore, after the February 17, 1998 incident, Ermann's supervisors removed him from duty above ground level. This evidence could support an inference that TIC supervisors believed that Ermann's diabetes significantly affected his ability to work. On the other hand, Defendant presents evidence that Ermann was rehired by TIC at least ten times for different jobs. This could support a finding that TIC did not regard Ermann as disabled. Thus, there are material disputes that preclude granting summary judgment for either party on the issue of whether Ermann was regarded as disabled.

B. Was Ermann a "qualified" individual?

It is undisputed that Ermann had the requisite skills for the position of pipefitter. Defendant argues, however, that Ermann's failure to keep his diabetes under control renders him unqualified. A diabetic who fails to take proper corrective measures to keep his diabetes under control does not state a claim under the ADA. *See Burroughs v. City of Springfield*, 163 F.3d 505, 508-09 (8th Cir. 1998).

Defendant uses a simple tautology to make its claim: Ermann does not have insulin reactions when he takes the proper amount of insulin and snack breaks at appropriate intervals; Ermann had insulin reactions on February 10, 17, and 27, 1998; therefore, Ermann did not properly control his diabetes. Although Defendant's logic has superficial appeal, I find it overly simplistic. It is undisputed that Ermann did take prescribed daily insulin injections, and that after the February 17, 1998 incident his physician lowered his insulin dose by 5 mg. It is also undisputed that Ermann took daily snack breaks, and that when he felt his blood glucose level

7

falling on February 27, 1998 he took a break to eat candy and a soda. The nature and severity of the February 10, 1998 and February 27, 1998 incidents are disputed, however. Defendant presents evidence that these incidents were significant insulin reactions, similar to the February 17, 1998 incident where Plaintiff lost consciousness. Plaintiff presents evidence that these incidents were normal precautionary breaks taken by Ermann when he felt his blood sugar was too low. Furthermore, Ermann presents evidence from potential medical expert witnesses that these low blood sugar incidents are not unusual for insulin-dependent diabetics who have their diabetes under control. Ermann also presents evidence that on the days when he took his morning snack later than usual, it was because he felt pressured by snide remarks from other TIC supervisors and employees.

I conclude that factual issues remain as to whether Ermann failed to keep his diabetes under control, particularly on February 27, 1998 when he was terminated. A reasonable jury could believe Ermann's claims that he took all reasonable steps to control his diabetes, and that it is normal for a diabetic to have these "incidents."

### C. Was Ermann discharged for legitimate safety concerns?

Defendant alleges that Ermann was not discharged because of his diabetes, but because he posed a direct threat to his own safety and the safety of other workers. In support of this allegation, Defendant presents evidence that Plaintiff had three diabetic episodes in less than one month, that Plaintiff had lost consciousness during the February 17, 1998 episode, and that Wayne Brazier and two other TIC supervisors had discussed the safety implications if Plaintiff again lost consciousness while he was "running a torch" or a "nine-inch grinder."

An insulin-dependent diabetic who cannot safely perform the essential duties of a job does not state an ADA claim. *See Kapche v. City of San Antonio*, 176 F.3d 840, 842-43 (5th Cir.

8

1999). The EEOC implementing regulations require that an analysis of whether an individual poses a direct threat to the health or safety of others must be evaluated based on an individualized assessment of the person's ability to perform the essential job duties. *See* 29 C.F.R. § 1630.2(r).

Again, material factual disputes prevent summary judgment on this issue. Although Defendant presents evidence of three "incidents" that it alleges constituted potential safety risks, Ermann lost consciousness in only one incident. After that incident, he reduced his insulin level and was assigned to ground level work. A reasonable jury could believe Ermann and conclude that the February 27, 1998 incident was a normal precautionary measure by Ermann to get his blood sugar balanced rather than a serious insulin reaction. In support of this, Ermann presents evidence that he was already back at work after taking some candy and a soda when Brazier came to his work site and terminated him. On the other hand, a reasonable jury could also believe Defendant's allegations that Ermann appeared disoriented, "drunk," and about to lose consciousness as he had on February 17, 1998. Therefore, summary judgment is inappropriate on this issue as well.

### D. Punitive Damages

Under the ADA, punitive damages may be awarded if an employer engages in any discriminatory practice with "reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a (b)(1). Plaintiff presents evidence that he was immediately terminated by Mr. Brazier after the February 27, 1998 incident even though Brazier did not witness the incident and he was already back at work. He also presents evidence that Brazier did not contact the TIC personnel director before terminating Ermann, and that the termination was without warning. Furthermore, Plaintiff presents evidence that at least one TIC supervisor, Mr. Starkey, commented that he did not want a diabetic on his crew even though Starkey had received

9

ADA training. Taken as a whole, this evidence could establish reckless disregard for Ermann's rights. Therefore, summary judgment on punitive damages is inappropriate at this time.

**IV. Conclusion**

Wherefore,

IT IS ORDERED that Defendant's Motion for Summary Judgment *(Doc. 54)*, filed March 17, 2000, is **denied**.

IT IS FURTHER ORDERED that Plaintiff's Motion for Partial Summary Judgment *(Doc. 59)*, filed March 23, 2000, is **denied**.

_____
LESLIE C. SMITH
UNITED STATES MAGISTRATE JUDGE